Chris Holm (SBN 249388)
chris.holm@novakdruce.com
NOVAK DRUCE CONNOLLY BOVE + QUIGG
333 Grand Ave., Suite 2300
Los Angeles, CA 90071
(213) 787-2500

Wes Klimczak (SBN: 294314)
wes.klimczak@novakdruce.com
NOVAK DRUCE CONNOLLY BOVE + QUIGG
21771 Stevens Creek Blvd., Suite 1
Cupertino, CA 95014
(408) 414-7330

Attorneys for Defendants
        Inventergy, Inc., and
        Inventergy, Global, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONUS NETWORKS, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>INVENTERGY, INC., and<br>INVENTERGY GLOBAL, INC.<br><br>     Defendants. | Case No. 3-15-cv-00322-EMC<br><br>The Honorable Edward M. Chen<br><br>**CLEAN VERSION**<br><br>DEFENDANTS' MOTION TO DISMISS COUNTS 1 – 7 OF SONUS' SECOND AMENDED COMPLAINT UNDER FRCP 12(B)(1) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE DISTRICT OF MASSACHUSETTS, AND MOTION TO DISMISS COUNTS 8 – 10 OF SONUS' SECOND AMENDED COMPLAINT UNDER FRCP 12(B)(6)<br><br>Date:   July 23, 2015<br>Time:   1:30 p.m.<br>Location:  Courtroom 5<br><br>SECOND Amended Complaint Filed:<br>  May 15, 2015 |

NOTICE IS HEREBY GIVEN that on July 23, 2015 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the above-referenced Court, Defendants Inventergy, Inc. and Inventergy Global, Inc. (collectively referred to as "Inventergy") will move for an order dismissing Declaratory Judgment Counts 1 – 7 filed by Sonus Networks, Inc. ("Sonus") for lack of subject matter jurisdiction, or in the alternative, to transfer those counts to the District of Massachusetts, and for an order dismissing Counts 8 – 10 of Sonus' Second Amended complaint because Sonus has failed to state a claim upon which relief can be granted. This motion is based on this instant motion, the memorandum of points and authorities in support thereof, and the Declarations of Wayne Sobon and Joseph Beyers attached hereto.

Dated: May 29, 2015

Respectfully submitted,

Novak Druce Connolly Bove + Quigg LLP


By:  /s/Chris L. Holm
_____
Chris L. Holm
Attorneys for Defendants Inventergy, Inc.,
and Inventergy, Global, Inc.

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................. 2

II. PLAINTIFF CANNOT SHOW A REAL, SUBSTANTIAL, AND IMMEDIATE DISPUTE BETWEEN THE PARTIES AND THEREFORE CANNOT ESTABLISH SUBJECT MATTER JURISDICTION ........................................ 9

    A.  Relevant Law Holds There Was No Actual Controversy Such That A Declaratory Judgment Action Could be Filed ........................... 9

    B.  There Simply was not an Actual Controversy and Sonus Lulled Inventergy into a False Sense of Security ............................... 10

        1.  Inventergy's January 10, 2015 email did not create an actual controversy sufficient to establish declaratory judgment jurisdiction. ...................................................... 11

        2.  Inventergy's actions after Sonus filed suit have no bearing on whether an actual controversy existed when Sonus filed suit. ......... 12

    C.  The Facts that Sonus only Learned After the Filing of Its First Amended Complaint are Irrelevant to Whether Declaratory Judgment Jurisdiction Existed ..................................................... 12

    D.  Even if the Court Finds that there is an Actual Case or Controversy, it should Exercise its Discretion and Decline to Enter a Declaratory Judgment ...... 13

III. SONUS FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED FOR ITS COUNTS OF CIVIL RICO AND UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 ........................................................... 15

    A.  The Accused Conduct Alleged to Form the Basis for the Civil RICO and Unfair Business Practices Claims are Immune from Liability under Noerr-Pennington ........................................................ 16

    B.  Inventergy's Negotiations with Sonus are Immune as a Matter of Law under Noerr Pennington .................................................. 17

    C.  Inventergy's Communications with Sonus were all made in Good Faith .............. 19

i

| | | | | |
|---|---|---|---|---|
| D. | | Sonus' Allegations of Inventergy's "High Aggression" Litigation Tactics and Its Purported Intention to not offer Standards Licenses to SEPs as Evidence of Bad Faith are Without Merit. | | 22 |
| E. | | Noerr-Pennington also Precludes the State Law Claim for Unfair Competition under California Business and Professions Code § 17200 | | 24 |
| F. | | The Complaint Further Fails to Allege Facts Sufficient to Support Predicate Acts of Mail Fraud, Wire Fraud, Extortion, and California Unfair Competition | | 25 |
| | 1. | Sonus has Failed to Plead a Plausible Pattern of Racketeering Activity | | 25 |
| | 2. | Sonus' Allegations that Inventergy Committed Both Mail and Wire Fraud is Plead Woefully Inadequately | | 26 |
| | 3. | Sonus' Allegations that Inventergy Committed Extortion as a Predicate Act Is Also Woefully Inadequate | | 28 |
| G. | | The Complaint Fails to State a Claim for Unfair Competition under California Business and Professions Code § 17200 | | 29 |
| H. | | The Complaint Fails to State a Claim for Breach of Contract | | 30 |
| IV. | | IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS ACTION UNDER 28 U.S.C. § 1404(a) | | 32 |
| A. | | The Northern District of California is an Inconvenient Forum and this Action Should be Transferred to the District of Massachusetts | | 32 |
| B. | | The District of Massachusetts is the Most Convenient Forum | | 34 |
| V. | | CONCLUSION | | 35 |

**TABLE OF AUTHORITIES**

**Cases**

*3M Co. v. Avery Denison Corp.,*
    673 F. 3d 1372 (Fed. Cir. 2012)........................................................ 15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................ 30

*Bridge v. Phoenix Bond & Indem. Co.,*
    128 S. Ct. 2131, 2144 (2008) ................................................ 32

*Brokerage Concepts v. United States Healthcare,*
    140 F. 3d 494 (Fed. Cir. 1998) .............................................. 33

*Cat Tech LLC v. Tubemaster, Inc.,*
    528 F. 3d 871 (Fed. Cir. 2008) .............................................. 14

*Cel-Tech Communications v. La Cellular,*
    83 Cal. Rptr. 2d 548 (1999) ................................................... 34

*Deck v. Engineered Laminates,*
    349 F.3d 1253 (10th Cir.2003)............................................... 26

*Decker Coal Co. v. Commonwealth Edison Co.,*
    805 F.2d 834 (9th Cir. 1986)................................................. 38

*Dominant Semiconductors Snd. Bhd. v. OSRAM GmbH,*
    524 F. 3d 1254 (Fed. Cir. 2008)............................................ 22

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) .............................................................. 21

*EMC Corp. v. Norand Corp.,*
    89 F. 3d 807 (Fed. Cir. 1996)................................... 17, 18, 19

*Empress LLC v. City & Cnty. of S.F.,*
    419 F. 3d 1052 (9th Cir. 2005).............................................. 21

*Executive Software N Am. V. United States District Court,*
    24 F. 3d 1545 (9th Cir. 1994)................................................ 30

*Exergen Corp v. Wal-Mart Stores, Inc.,*
    575 F. 3d 1312 (Fed. Cir. 2009)............................................ 31

*FindTheBest.com, Inc. v. Lumen View Technology LLC,*
    20 F. Supp. 3d 451 (S.D. N.Y. 2014)................................... 26

*GAF Bldg. Materials Corp. v. Elk Corp.*,
    90 F.3d 479 (Fed. Cir. 1996)........................................................................... 17

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
    362 F. 3d 1367 (Fed. Cir. 2004)............................................................... 22, 29

*H.J, Inc. v. Nw. Bell Tel. Co*,
    492 U.S. 229 (1989)................................................................................... 30

*HTC Swed. AB v. Innovatech Prods. & Equip. Co.*,
    2008 WL 4510710 (E.D. Tenn. Sep. 30, 1998) ............................................ 34

*In Re Actimmune Marketing Litigation*,
    641 F. Supp. 2d 1037 (N.D. Cal. 2009) ..................................................... 32

*In re Graphics Processing Units Antitrust Lit.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................... 20

*In Re Innovatio IP Ventures, LLC Patent Litigation*,
    2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)............................................. 24, 25

*In Re Innovatio IP Ventures, LLC Patent Litigation*,
    921 F. 3d 903 (N.D. Ill. 2013)........................................................ 24, 29, 35

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
    599 F. 3d 1377 (Fed Cir. 2010).................................................................. 14

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000)...................................................................... 38

*MedImmune, Inc. v. Centocor, Inc.*,
    409 F.3d 1376 (Fed. Cir. 2005)................................................................. 16

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)....................................................................... 13, 14, 17

*Micron Technology, Inc. v. Mosaid Technologies, Inc.*,
    518 F. 3d 897 (Fed. Cir. 2008)............................................................. 18, 37

*Microsoft Corp. v. Motorola, Inc.*,
    2013 WL 5373179 (W.D. Wa. Sep. 24, 2013)........................................ 24, 36

*Odom v. Microsoft Corp*,
    486 F. 3d 541 (9th Cir. 2008)............................................................. 30, 31

*Prasco, LLC v. Medicis Pharm. Corp.*,
    537 F. 3d 1329 (Fed. Cir. 2008)................................................................ 14

*Russell Corp. v. Sara Lee Corp.*,
129 F. Supp. 2d 1165 (N.D. Ill. 2001) ............................................................................ 16

*SanDisk v. STMicroElectronics, Inc.*,
480 F. 3d 1372 (Fed. Cir. 2007).................................................................................. 15

*Scheidler v. Nat'l Org. for Women, Inc.*,
537 U.S. 393 (2003).................................................................................. 33

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F. 3d 797 (9th Cir. 2004).................................................................................. 37

*Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*,
363 F.3d 1361 (Fed. Cir. 2004).................................................................................. 16

*Sosa v. DIRECTV, Inc.*,
437 F. 3d 923 (9th Cir. 2006).................................................................................. passim

*Tal v. Hogan*,
453 F. 3d 1244 (10th Cir. 2006).................................................................................. 21

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965).................................................................................. 21

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir.2002).................................................................................. 26

*Universal Manufacturing Co. v. Douglas Press, Inc.*,
1991 WL 83156 (N.D. Ill. May 8, 1991) .................................................................................. 34

*Va. Panel Corp. v. MAC Panel Co.*,
133 F.3d 860 (Fed. Cir. 1997).................................................................................. 22, 32, 35

*Virtue v. Creamery Package Mfg. Co.*,
227 U.S. 8, 37 (1913).................................................................................. 22, 23, 31

**Statutes**

18 U.S.C. § 1341 .................................................................................. 31

18 U.S.C. § 1343 .................................................................................. 30

18 U.S.C. § 1951 .................................................................................. 33

18 U.S.C. § 1964(c) .................................................................................. 32

28 U.S.C. § 1367(c)(3) .................................................................................. 29

28 U.S.C. § 1404 .................................................................................. 6, 40

28 U.S.C. § 1404(a) .................................................................................. 35, 36

28 U.S.C. § 2201 ......................................................................................... 17, 18

28 U.S.C. § 2201(a) .......................................................................................... 5

**Other Authorities**

Cal. Penal Code § 518 ...................................................................................... 33

California Business and Professions Code § 17200 ................................. passim

Declaratory Judgment Act................................................................ 5, 14, 15, 19

Rules

Federal Rule of Civil Procedure Rule 9(b) ...................................................... 28

Federal Rule of Civil Procedure Rule 12(b)(6)................................................ 20

# MEMORANDUM OF POINTS AND AUTHORITIES

Counts 1 through 7 of Plaintiff's Second Amended Complaint fail to meet the most fundamental requirement in Federal Court: a justiciable case or controversy. Article III of the United States Constitution and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) require a real, substantial, and immediate controversy between parties, not merely a hypothetical dispute based on licensing negotiations without the threat of litigation. When Sonus filed its initial Declaratory Judgment action on January 26, 2015, no such controversy existed. As such, the Court does not have subject matter jurisdiction over this matter under the Declaratory Judgment Act, and the case must be dismissed. Even if subject matter jurisdiction exists, the Court should nevertheless use its discretion and dismiss Counts 1 - 7, because Sonus has improperly used the Declaratory Judgment Act hoping for a tactical advantage.

Moreover, Sonus' Counts 8 – 10 fail to state a claim for which relief can be granted for unfair competition under California Business and Professions Code § 17200 (Count 8), civil RICO (Count 9), and breach of contract (Count 10). The *Noerr-Pennington* doctrine requires Sonus' civil RICO and unfair competition claims be dismissed with prejudice. Both are based on pre-suit negotiations, and the entirety of those negotiations between the parties are protected under the 1st Amendment and cannot constitute grounds for either civil RICO or unfair competition. Even further, Sonus has failed to properly plead alleged predicate acts for civil RICO with any particularity. Moreover, Sonus' claim for breach of contract also fails because Sonus has not alleged that what Inventergy offered to Sonus during licensing negotiations even violated any reasonable and non-discriminatory ("RAND") licensing obligations that Inventergy has to any of its standards essential patents ("SEPs"), which in any event only comprise a portion of the patents offered to Sonus during negotiations.

In the alternative, if the Court finds that it does in fact have subject matter jurisdiction and decides not to exercise its discretion, the Northern District of California is an inconvenient forum under 28 U.S.C. § 1404. Inventergy has a pending case in the District of Massachusetts against Sonus for patent infringement of the same patents-in-suit as in this proceeding, filed only after

1

Sonus preemptively filed the original complaint, but before it added the allegations of Claims 8-10. When the Court considers the private and public factors, the instant case should be transferred to the District of Massachusetts if it is not dismissed.[1]

## I. INTRODUCTION

Inventergy specializes in helping protect a company's intellectual property, allowing them to continue their primary goal, creating new innovative products and services. Inventergy's business model focuses on cultivating strategic relationships with key developers of core technologies to help obtain fair compensation for their important contributions. Inventergy identifies, acquires, and licenses patent portfolios from those developers to help recoup at least some of the R&D investment, and help it reinvest into new technologies. Since its founding in 2013, Inventergy has emphasized that its business model focuses on having collaborative licensing conversations with the users of important, innovative, protected technology and to avoid litigation of disputes as much as possible.

The patents-in-suit derive from two global telecommunications companies (Huawei Technologies, Co., Ltd. and Nokia Corporation), who developed technology in the field of Internet Protocol ("IP") Multimedia Core Network Subsystems ("IMS") and the field of Voice-Over-Internet-Protocol ("VOIP"). IMS and VOIP technologies, in significant part pioneered by Huawei and Nokia, are deployed in more than one hundred countries and are used by most of the world's largest telecommunications operators. IMS and VOIP technologies are related and/or complimentary to numerous industry standards. The patents-in-suit, U.S. Patent Nos. 8,335,487 ("the '487 patent"); 7,925,762 ("the '762 patent"); 7,835,352 ("the '352 patent"); 8,185,105 ("the '105 patent"); 6,801,542 ("the '542 patent"); 7,583,612 ("the '612 patent") and 6,904,035 ("the '035 patent")" (collectively the "patents-in-suit") are just a few of the patents in the Inventergy portfolio related to IMS and VOIP technologies ("IMS/VoIP Portfolio"), which comprises some

---

[1] Because claims 1-7 fail for declaratory judgment jurisdiction, even if the Court finds that claims 8-10 still stand, they should be dismissed in favor of the now prior-filed suit in Massachusetts.

250 worldwide patents and patent applications. Inventergy acquired the patents-in-suit from Huawei and Nokia and now holds all relevant right, title, and interest in them (Sobon Dec. at ¶ 4).

Sonus makes and sells equipment that provides IMS and/or VOIP-related services, including session border controllers ("SBCs"), access gateways, converged gateways, and application servers. Those Sonus products benefited from the R&D efforts of the original developers of the patented technology. Sonus boasts that by using its products, "the world's leading service providers and enterprises can embrace the next generation of SIP and 4G/LTE solutions including VoIP, video, instant messaging and online collaboration" ([http://www.sonus.net/en](http://www.sonus.net/en)). Sonus products and services directly implement IMS technology.

In July of 2013, Inventergy requested an in-person meeting with Sonus to discuss a possible license to its IMS and VOIP patent portfolio (Sobon Dec. at ¶ 5). The first of three in-person meetings at the Sonus headquarters in Westford, Massachusetts occurred on August 5, 2013 (Sobon Dec. at ¶ 6). Mr. Joseph Beyers, CEO of Inventergy, and Mr. Wayne Sobon attended that meeting, during which Inventergy presented its acquired Huawei IMS/VOIP patent portfolio, discussed its business model of engaging in productive, collaborative conversations with potential licensees such as Sonus, and indicated its sincere desire to find a mutually beneficial business arrangement (Sobon Dec. at ¶ 6). During this discussion, Inventergy never indicated it would file suit against Sonus, instead emphasizing its sincere goal to engage in good-faith negotiations (Sobon Dec. at ¶ 6).

Shortly thereafter, on August 21, 2013, Inventergy participated in an online meeting to provide further information to Sonus (Sobon Dec. at ¶ 7). In arranging this meeting, Inventergy confirmed with Sonus that the discussions would be conducted under confidentiality (Sobon Dec. at ¶ 7). During this meeting, Inventergy identified certain Inventeryg IMS/VOIP patents that covered technologies potentially relevant to certain of Sonus' products (Sobon Dec. at ¶ 7). Inventergy presented, and also later provided Sonus a copy, a slide deck that contained a brief overview of certain Inventergy IMS/VOIP patents (Sobon Dec. at ¶ 7). Of note, the slide deck was labeled "Confidential" and a lower disclaimer indicated: "brief overviews provided for general discussion purposes only" (Sobon Dec. at ¶ 7). During this meeting, Inventergy reiterated

its desire to find a mutually beneficial business resolution and at no point indicated any intention or otherwise referenced filing suit against Sonus (Sobon Dec. at ¶ 7). The parties again had another online meeting on October 23, 2013, similar to the August 21, 2013 meeting (Sobon Dec. at ¶ 7). During this meeting, Sonus also presented material it marked confidential (Sobon Dec. at ¶ 7).

On November 26, 2013, Sonus and Inventergy continued the discussions of a potential license to Inventergy's IMS/VOIP patents in another online meeting (Sobon Dec. at ¶ 8). At this meeting, Inventergy presented, and later provided copies, to Sonus materials that identified certain patents that had been submitted to and incorporated by certain standard setting organizations and claim charts for several Inventergy IMS/VOIP patents, including three of the patents-in-suit, again all labeled Confidential (Sobon Dec. at ¶ 8). Inventergy also addressed positions taken by Sonus during the October 23, 2013 meeting (Sobon Dec. at ¶ 8). Throughout these discussions, Inventergy expressed its desire to continue to engage in good-faith business discussions to negotiate a resolution, and again made no indication about filing suit, and neither party suggested any impasse to discussions (Sobon Dec. at ¶ 8).

On February 18, 2014, Inventergy had the second of three in-person meetings with Sonus in Westford, Massachusetts, including three principals of Inventergy, Joseph Beyers, Wayne Sobon and Anna Johns, who had just joined Inventergy to help its licensing program (Sobon Dec. at ¶ 9). All three Inventergy principals came to Sonus' Westford headquarters (in a snowstorm) (Sobon Dec. at ¶ 9). Licensing negotiations continued during this meeting, including a proposed licensing arrangement to the entire IMS/VOIP portfolio, but no agreement was reached. Despite not reaching agreement, Inventergy made no threat of litigation and instead both parties reiterated the desire to continue the business negotiations (Sobon Dec. at ¶ 9). During the meeting, Inventergy and Sonus agreed that the next step in the process was for Inventergy to send a draft license agreement along the lines that had been outlined (Sobon Dec. at ¶ 9). Thereafter, at the end of April 2014, Inventergy sent Sonus a proposed license agreement (Sobon Dec. at ¶ 9).

On May 26, 2014, Inventergy reached out to Sonus indicating that it had just signed an agreement to acquire additional assets (the Nokia patents) relevant to Sonus' products (Sobon

Dec. at ¶ 10). Because the terms of the agreement restricted disclosure of the acquisition unless a formal written NDA was in place, Inventergy requested that Sonus sign a Non-Disclosure Agreement ("NDA") to formalize the confidentiality under which the discussions had been proceeding (Sobon Dec. at ¶ 10).

On June 18, 2014, after Inventergy formally acquired the additional Nokia IMS/VoIP patents, Inventergy notified Sonus, including an identification of patents that had been declared to the European Telecommunications Standards Institute ("ETSI"). Inventergy also inquired as to whether Sonus was available to continue the agreed licensing discussions (Sobon Dec. at ¶ 11).

On August 7, 2014, Inventergy met with Sonus for the third in-person meeting at Sonus' Westford, Massachusetts facility (Sobon Dec. at ¶ 12). At the beginning of that meeting, Sonus signed the NDA, which specified that: "Without limiting the foregoing, Recipient [Sonus] shall not use Discloser's [Inventergy] Confidential Information in connection with any litigation or administrative action initiated by Recipient against Discloser" (Sobon Dec. at ¶ 12). At the meeting, Inventergy walked Sonus through (and subsequently transmitted) a set of claim charts to relevant Inventergy IMS/VOIP patents, subject to the NDA (Sobon Dec. at ¶ 12). Both Sonus General Counsel Jeff Snider and Inventergy General Counsel Wayne Sobon agreed it would be useful to continue talking about potential business arrangements (Sobon Dec. at ¶ 12). In particular, Mr. Sobon reiterated a suggestion originally made by Mr. Snider that there might be alternative approaches, including licensing only a portion of the IMS portfolio relevant to Sonus' business, and Mr .Sobon and Mr. Snider agreed to further consider such alternative licensing structures (Sobon Dec. at ¶ 12).

In December of 2014, Mr. Beyers engaged in a series of at least three separate discussions with Sonus, all concerning potential business deals, payment strategies and amounts (Beyers Dec. at ¶ 2). On January 10, 2015, having not heard from Mr. Snider for an extended period of time, Mr. Beyers sent an email that further related certain of Sonus' products against certain Inventergy IMS/VOIP patents (Sobon Dec. at ¶ 14). The January 10, 2015 email communication was marked as not subject to the Inventergy-Sonus NDA (Sobon Dec. at ¶ 14). The parties traded emails afterwards, including Mr. Snider stating on January 16th that he wanted to find time to

continue discussions, indicating that he had "asked [his] CFO, Mark Greenquist, to join us on the call, in the hopes that we can be successful with his involvement" (Sobon Dec. at ¶ 14). On January 20th, Mr. Snider agreed to set up a telephone conference with him and Mr. Greenquist and the Inventergy team the following day, January 21, 2015 (Sobon Dec. at ¶ 14).

During the January 21, 2015 call, although Inventergy and Sonus had not agreed on any final value, the parties agreed that they were making progress in the negotiations (Beyers Dec. at ¶ 4). Responding to an inquiry from Sonus, Mr. Byers initially suggested it was important to agree to a resolution within two weeks to ensure that Inventergy was in a position to provide some of the benefits previously discussed, including treating Sonus as a first licensee for an overall deal to the entire IMS/VoIP portfolio [2] (Beyers Dec. at ¶ 4). Mr. Snider responded that while he was committed to continuing discussions with Inventergy, at the time Sonus was focused on an upcoming deadline to file its annual report with the SEC and its February 19, 2015 shareholder meeting (Beyers Dec. at ¶ 4). Mr. Snider stated that, therefore Sonus would be unable to finalize a deal before February 19th (Beyers Dec. at ¶ 4). In response, Mr. Beyers accommodated Sonus' concern, stating that it would be satisfactory if in the next two weeks, Sonus could confirm its good-faith intent to continue to negotiate and close a business deal with Inventergy after February 19, 2015 (Beyers Dec. at ¶ 4). Mr. Snider assured Mr. Beyers that Sonus would continue to engage in further good faith negotiations, but in order to avoid any issues of disrupting their final annual reporting processes, Mr. Snider repeated that he did not believe a final deal could be negotiated until after February 19, 2015 (Beyers Dec. at ¶ 4). Mr. Beyers reiterated Inventergy's interest in working in good faith to arrive at a business deal and willingness to cooperate with Sonus to address its timing concern as the parties worked toward resolution and attempt to reserve Sonus' first-licensee status if possible (Beyers Dec. at ¶ 4). Sonus in turn stated it was good for Mr. Greenquist to have attended and met with the Inventergy team, that it had been a useful conversation, and agreed that, in the meantime, it would consider

---

[2] Indeed, Inventergy later signed a $2 million license to Inventergy's overall IMS/VoIP portfolio with a competitor of Sonus, after Sonus' initial complaint, in February 2015.

Inventergy's latest position and would provide its response at a later time (*Id.*). At no point during these discussions did anyone from Inventergy indicate that it had any intentions of filing a lawsuit against Sonus, and importantly it was evident that no impasse had been reached (*Id.*).

Two days later, and despite Sonus' verbal assurances and Inventergy's unconditional commitment to continue to engage in good-faith negotiations after Sonus' shareholder meeting, Sonus filed this declaratory judgment action on Friday, January 23, 2015 in the Northern District of California, seeking declaratory relief of non-infringement of the patents-in-suit. That same morning, Mr. Snider called Mr. Beyers to inform him that Sonus had filed its Declaratory Judgment Complaint. Mr. Snider apologized to Mr. Beyers, stating "before you get angry" "let me tell you what we have done and why" and explained that Sonus filed the action because it felt it would not be able to continue with discussions until after February 19, and "needed to preserve their rights" (Beyers Dec. at ¶ 5). Despite its actions, Mr. Snider indicated that Sonus still wanted to continue business discussions (Beyers Dec. at ¶ 5).

On the following Monday, January 26, 2015, given that Sonus had now intemperately filed its lawsuit against Inventergy, Inventergy filed a complaint for patent infringement of the patents-in-suit in the District of Massachusetts (15-cv-10207-MLW). Inventergy served its complaint upon Sonus the same day. Sonus then served its complaint upon Inventergy on Tuesday, January 27, 2015. On February 17, 2015, Inventergy filed its initial Motion to Dismiss Counts 1 – 7 of Sonus' complaint [Dkt. No. 13] and briefing on this motion was complete as of March 10, 2015 when Inventergy filed its reply to Sonus' opposition to Inventergy's Motion to Dismiss [Dkt No. 28]. However, also on March 10, 2015, and without notifying Inventergy, Sonus filed its Amended Complaint [Dkt. No. 26], re-alleging non-infringement in Counts 1-7, and alleging additional Counts 8 – 10 for civil RICO, unfair competition under California Business and Professions Code § 17200, and for breach of contract. Inventergy filed its Motion to Dismiss Sonus' Amended Complaint on March 24, 2015 [Dkt. No. 34], along with a Motion to Strike Sonus' unfair competition claim [Dkt. No. 35] under California's anti-SLAPP statute. Sonus' filed its opposition to Inventergy's motions on April 7, 2015 [Dkt. Nos. 38 and 39], along with a Motion for Leave to file its Second Amended Complaint [Dkt. No. 40]. On April 13,

2015, the Court took Inventergy's Motion to Dismiss and Motion to Strike Sonus' Amended Complaint off calendar pending resolution of Sonus' Motion for Leave to File Second Amended Complaint [Dkt. No. 44]. On April 21, Inventergy filed its opposition to Sonus' Motion for Leave [Dkt. No. 46], and on April 28, Sonus filed its reply to Inventergy's opposition [Dkt. No. 48]. On May 11, 2015, the Court granted Sonus' Motion for Leave to File Second Amended Complaint [Dkt. No. 52], and on May 15, 2015, Sonus filed its Second Amended Complaint.

Contrary to allegations contained in Sonus' Second Amended Complaint (*see e.g.,* Second Amended Complaint ¶¶ 7, 30, 73), Inventergy never stated to Sonus that there would be an "IP bloodbath" or that Inventergy would say "some nasty things" about Sonus during any litigation between the parties (Beyers Dec. at ¶ 6). Further, Inventergy never made any misrepresentations to Sonus regarding any of the patents-in-suit, or other patents within any of Inventergy's portfolio (Beyers Dec. at ¶ 9). At all times, Inventergy has had a good-faith belief that the Inventergy portfolio is relevant to Sonus' business, and presented its position to Sonus via the negotiations and discussion described *supra* (Sobon Dec. at ¶ 16). Further, during Inventergy's negotiations with Sonus, the parties had discussions about exemplary royalty rates that have been negotiated and accepted in the industry. And in these discussions, Inventergy proposed a royalty payment that was much less than between $24 million and $97 million (Compare Second Amended Complaint at ¶ 66 to Beyers Dec. at ¶ 8). During the negotiations, Sonus never indicated that the licensing fees being discussed did not comply with RAND obligations that Inventergy might have (Beyers Dec. at ¶ 8). Further, Inventergy identified that a license for just a set of patents in the Inventergy portfolio, including potentially just SEPs relevant to the Sonus business, could be negotiated for a smaller rate than the entire Inventergy portfolio. (Beyers Dec. at ¶ 10).

Because there was no imminent threat of litigation when Sonus filed its Declaratory Judgment action, particularly in view of the commitment given by Inventergy during the January 21, 2015 meeting two days before Sonus filed its first complaint, *i.e.*, the mutual agreement to continue discussions, and that during the course of contact between the parties there was never an imminent threat of litigation and only licensing negotiations, the Court lacks subject matter jurisdiction over Counts 1 – 7, and these Counts should be dismissed. Moreover, the *Noerr-*

*Pennington* doctrine requires that Sonus' claims for civil RICO and unfair competition (Counts 8 – 9) be dismissed with prejudice. Even further, Sonus has failed to properly plead the alleged predicate acts for civil RICO with any particularity. Finally, Sonus' claim for breach of contract fails because Sonus has not alleged that what was offered by Inventergy to Sonus during licensing negotiations even violated any RAND licensing obligations that Inventergy has to its SEPs which, in any case, comprise only a portion of the patents offered to Sonus.

## II. PLAINTIFF CANNOT SHOW A REAL, SUBSTANTIAL, AND IMMEDIATE DISPUTE BETWEEN THE PARTIES AND THEREFORE CANNOT ESTABLISH SUBJECT MATTER JURISDICTION

When Sonus filed its initial Declaratory Judgment action, it had no basis to contend that Inventergy might immediately sue them for patent infringement. Article III of the Constitution and the Declaratory Judgment Act do not permit Federal Courts to exercise jurisdiction over hypothetical facts. Under *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007), and the Federal Circuit's case law interpreting *MedImmune,* a declaratory judgment action requires a real, substantial, and immediate case or controversy. There was no such immediate case or controversy here.

### A. Relevant Law Holds There Was No Actual Controversy Such That A Declaratory Judgment Action Could be Filed

In *MedImmune,* the Supreme Court explained that an Article III case or controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests" and be "real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127. Thus "all the circumstances" must demonstrate "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

The conduct of both parties is relevant in evaluating all the circumstances. The conduct of the declaratory judgment plaintiff must create a real, immediate, and substantial potential for infringement, and the conduct of the patentee must create a real, immediate, and substantial potential for a claim of infringement against the declaratory judgment plaintiff. Without such activity by both parties, there is only a hypothetical, potential, and indefinite dispute, not a real,

immediate, and substantial controversy between parties. *See Prasco, LLC v. Medicis Pharm. Corp.,* 537 F. 3d 1329, 1339 (Fed. Cir. 2008) (*MedImmune* "did not change the bedrock rule that a case or controversy must be based on a real and immediate injury or threat of future injury that is caused by the [declaratory judgment] defendants"); *Cat Tech LLC v. Tubemaster, Inc.,* 528 F. 3d 871, 880 (Fed. Cir. 2008) (test for justiciability "looks to the [declaratory judgment] plaintiff's conduct and ensures that the controversy is sufficiently real and substantial.")

Prior to *MedImmune*, courts looked to a "reasonable apprehension test." That is no longer the test, and following *MedImmune,* the Federal Circuit has held that subject matter jurisdiction requires at least (1) an affirmative act by the patentee directed toward the declaratory judgment plaintiff AND (2) current activity by the declaratory judgment plaintiff that could constitute infringement or significant, concrete steps toward conducting infringing activity. *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.,* 599 F. 3d 1377, 1382 (Fed Cir 2010); *Prasco, LLC v. Medicis Pharm. Corp.,* 537 F. 3d 1329, 1335 n. 4 (Fed. Cir 2008). The declaratory judgment plaintiff bears the burden of proving the existence of a justiciable controversy at the time they initiated the lawsuit. *Innovative Therapies,* 599 F. 3d at 1382-84.

## B. There Simply was not an Actual Controversy and Sonus Lulled Inventergy into a False Sense of Security

Sonus cannot meet its burden in proving that there was a sufficient affirmative act by Inventergy toward Sonus creating the necessary imminent threat of litigation. A ripe declaratory judgment claim does not arise simply because a party perceives there to be a risk of patent infringement 'without some affirmative act by the patentee.' *SanDisk v. STMicroElectronics, Inc.,* 480 F. 3d 1372, 1381 (Fed. Cir. 2007). "[A]llegations alone are insufficient to meet the complainant's burden to establish jurisdiction." *3M Co. v. Avery Denison Corp.,* 673 F. 3d 1372, 1378 (Fed. Cir. 2012). Further, and contrary to the implication by Sonus, an infringement case filed by Inventergy against another party a half-year earlier (*see* Second Amended Complaint at ¶ 23), does not create a real and immediate controversy between Inventergy and Sonus. As the facts above indicate, the plain actions of Inventergy and Sonus at all times indicated that the parties were involved solely in licensing negotiations. At the time Sonus filed this declaratory judgment action, Inventergy had committed itself to engage in good-faith negotiations and even

postpone such discussions until after February 19, 2015, at Sonus' request. Further, the claim charts provided to Sonus by Inventergy were confidential, which the formalized NDA prohibited Sonus from using to support a later-filed declaratory judgment action, and such claim charts were presented to further the mutual discussions (Sobon Dec. at ¶¶ 10, 12).

### 1. Inventergy's January 10, 2015 email did not create an actual controversy sufficient to establish declaratory judgment jurisdiction.

Any argument that the January 10, 2015 email established an actual controversy sufficient to fall within the Declaratory Judgment Act must fail, and for that reason the Court has no subject matter jurisdiction. The fact that the parties participated in a substantive negotiation on January 21, well after the January 10, 2015 email (along with their interchanges between January 10 and January 21) establishes that no actual controversy existed at the time Sonus filed this DJ action, by Sonus' own (albeit broken) words, promises and actions. During that January 21 meeting, Sonus assured Inventergy that they would not do anything to upset the finalizing of a deal between the parties and that the only reason they could not continue with the negotiations and finalize a deal then was because of their upcoming SEC annual report and shareholder meeting. In response to the introduction of this timing issue, Inventergy agreed that it was committed to continuing the parties' good-faith negotiations, including accommodating Sonus' timing request. The negotiations had not broken down, and both parties expressed their mutual interest and hope that they could reach a negotiated agreement. Through its action, Sonus lulled Inventergy into a false sense of security, apparently with the intention of quickly filing this DJ action against Inventergy, which it did only two days later. Sonus' unilateral decision to renege on its promise to continue to negotiate in good faith should not create the actual controversy necessary to attach declaratory judgment jurisdiction. "Certainly a party should not be permitted to itself initiate negotiations and use them to lull its prospective opponent into delaying suit so that it can strike the first blow itself." *Russell Corp. v. Sara Lee Corp.,* 129 F. Supp. 2d 1165, 1169 (N.D. Ill. 2001) (finding that such a factor is a reason for granting a motion to dismiss a declaratory judgment action for lack of subject matter jurisdiction). This is exactly what happened here and Sonus should not be rewarded for its apparent deceitful behavior.

### 2. Inventergy's actions after Sonus filed suit have no bearing on whether an actual controversy existed when Sonus filed suit.

The Federal Circuit has repeatedly made clear that events occurring after a declaratory judgment complaint is filed have no bearing on whether the DJ plaintiff had a jurisdictional basis for suit when it filed the complaint. *See MedImmune, Inc. v. Centocor, Inc.*, 409 F.3d 1376, 1381 (Fed. Cir. 2005); *Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1376 (Fed. Cir. 2004); *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed. Cir. 1996). Inventergy's filing of a patent infringement complaint after Sonus filed its DJ complaint has no bearing on whether an actual controversy existed.

### C. The Facts that Sonus Supposedly Learned Only After the Filing of Its First Amended Complaint are Irrelevant to Whether Declaratory Judgment Jurisdiction Existed

The additional facts alleged in Sonus' Second Amended Complaint do nothing to change the fact that the Court still does not have subject matter jurisdiction over Counts 1 – 7 of Sonus' complaint.  These "new" "facts" include: (1) purported admissions made by Inventergy in its March 11, 2015 and March 31, 2015 SEC filings regarding its supposedly "high aggression" litigation tactics and purported intention to not offer standards license to SEPs from its Huawei and Nokia portfolios (the patents-in-suit for these proceedings are part of the Huawei and Nokia portfolios)  (See Second Amended Complaint at ¶¶ 25-27, 34-35); (2) purported admissions by Inventergy that it was aware that its patents were SEPs and that its predecessors had declared these to ETSI (See Second Amended Complaint at ¶¶ 18-20, 149-152); and (3) that Sonus informed Inventergy that it was obligated to license SEPs on RAND terms during licensing negotiations, and that Inventergy purportedly stated that the parties would have to "agree to disagree on RAND"  (See Second Amended Complaint at ¶¶ 71).  The facts that Sonus only learned after the filing of its First Amended Complaint are irrelevant to whether declaratory judgment jurisdiction existed, and cannot be used to establish whether an actual case or controversy existed at the time it filed its original complaint.  *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed. Cir. 1996) ("justiciability must be judged as of the time of filing").  Thus, these "new facts" should only be considered as they relate to Claims 8-10 of the Second Amended Complaint, discussed *infra*.

**D.** **Even if the Court Finds that there is an Actual Case or Controversy, it should Exercise its Discretion and Decline to Enter a Declaratory Judgment**

Assuming, *arguendo,* that the Court finds that there is an actual case or controversy under 28 U.S.C. § 2201, the Court should exercise its discretion and decline to enter a declaratory judgment action based upon the actions of Sonus leading up to the filing of its complaint, and its later actions. The facts of this case are strikingly similar to those of *EMC Corp. v. Norand Corp.,* 89 F. 3d 807 (Fed. Cir. 1996) *overruled in part on other grounds*, *MedImmune v. Genentech,* 549 U.S. 118 (2007), in which the Court exercised its discretion in declining to enter a declaratory judgment action, even though the Court found there was an actual case or controversy.

Moreover, although *EMC* was decided pre-*MedImmune,* there has been no change to the plain language of the Declaratory Judgment Act, which states that a Court "may" declare the rights and other legal relations of any interested party seeking such declaration. *See* 28 U.S.C. § 2201. Still further, post-*MedImmune* case law from the Federal Circuit still supports the District Court's ability to decline jurisdiction, even if there is an actual case or controversy. *See, e.g. Micron Technology, Inc. v. Mosaid Technologies, Inc.,* 518 F. 3d 897, 903 (Fed. Cir. 2008).

In *EMC,* Norand requested that *EMC* engage in three meetings to discuss *EMC* potentially licensing Norand's patents. *Id.* at 809. The parties met, and agreed that the meetings would not be used as a basis for a declaratory judgment action. *Id.* There was a dispute amongst the parties regarding whether explicit claims of infringement were ever made, or whether Norand ever threatened suit. *Id.* Norand subsequently sent a letter to *EMC* officials confirming plans for a fourth meeting and assuring *EMC* that it would call later in the week to arrange a time for the meeting. *Id.* Two days later, however, *EMC* filed its declaratory judgment action. *Id.* A telephone message left by an *EMC* attorney on the day after the filing indicated that *EMC* had taken the step because its management "thought it was in their interest to protect themselves first and continue discussions." *Id.* The parties held two further meetings while the action was pending and scheduled a third meeting, but that meeting was later canceled. *Id.*

Norand moved to dismiss for lack of subject matter jurisdiction. In exercising its discretion to dismiss, the District Court held the filing of a declaratory judgment action may place

the plaintiff in a more favorable bargaining position with the defendant and would force the "defendant to consider whether as a practical matter it would be better to avoid litigation costs and any risk of adverse rulings that might render their patents less valuable" and "the mere pendency of the lawsuit may negatively affect the value of the defendant's patents in that market and the price any potential purchaser, either the plaintiff or another prospective purchaser, might be willing to pay." *Id.* at 810. "The court therefore determined that to exercise its discretionary jurisdiction in this case would create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings." *Id.*

While the Federal Circuit found that even though there was an actual case or controversy under the Declaratory Judgment Act, "simply because there is an actual controversy between the parties does not mean that the district court is required to exercise that jurisdiction. The Act states that a court *may* grant declaratory relief." *Id.* at 813.

> While a court may conclude that ongoing negotiations do not negate the presence of a controversy for jurisdictional purposes, the court may nonetheless find, in deciding whether to hear the declaratory judgment action, that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute. *Id.* at 814.

> The day after the complaint was filed, *EMC's* senior intellectual property counsel called Norand's outside patent counsel and explained that the declaratory judgment complaint had been filed as <u>merely a defensive step</u> and that *EMC* "<u>would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term.</u>" *Id.* at 815 (emphasis added).

Similar to *EMC,* even if an actual case or controversy exists, the Court should exercise its discretion and decline to enter a declaratory judgment action. In the case-at-hand, the parties engaged in numerous discussions before Sonus filed its DJ action. During the last pre-suit meeting, Inventergy and Sonus assured one another that they had interest in working in good faith to come to a business resolution, and Inventergy agreed to postpone substantive discussions at Sonus' request. Moreover, despite filing of the complaint, Sonus stated that they were only filing their complaint to preserve "their rights" until they had filed their Annual Report and held their shareholder meeting, and that they would continue negotiations. Sonus was even apologetic in its

14

conversations with Inventergy after informing Inventergy that they had filed the action (Beyers Dec. at ¶ 5).

In declining to exercise its discretion, the *EMC* court noted that it would be unfair to grant DJ jurisdiction when a party clearly lulled the other party into a false sense of security in order to gain a tactical advantage. *EMC,* 89 F. 3d at 807. As in *EMC*, it is apparent that Sonus filed the suit with the intent to gain a tactical advantage by forcing Inventergy to "consider whether as a practical matter it would be better to avoid litigation costs and any risk of adverse rulings that might render their patents less valuable." *EMC,* 89 F. 3d at 807. Specifically, Mr. Snider threatened that if the litigation between the parties goes forward, Sonus would damage Inventergy's patent portfolio and in its ability to license it (Beyers Dec. at ¶ 5 ). Because the facts show that Sonus filed the DJ complaint to put them in a better negotiating position as the parties continue to attempt to negotiate a business deal, the Court should decline to enter a declaratory judgment action as to Counts 1 – 7 because the circumstances surrounding and immediately following the filing of the complaint support this decision.

### III. SONUS FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED FOR ITS COUNTS OF CIVIL RICO AND UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200

A motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) tests the legal sufficiency of the complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *In re Graphics Processing Units Antitrust Lit*., 527 F. Supp. 2d 1011, 1018 (N.D. Cal. 2007). "All allegations of material fact [in the complaint] are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Id.*

To be explained in further detail below, all of Inventergy's pre-suit communications with Sonus are protected speech under the *Noerr-Pennington* doctrine because Inventergy was merely

engaged in lawful patent licensing negotiations with Sonus regarding valid and enforceable patents that Inventergy had a good-faith basis for believing Sonus needed a license. The *Noerr-Pennington* doctrine, as interpreted by both the Supreme Court and the Federal Circuit, protects such pre-suit patent licensing negotiations under the First Amendment. As the entirety of Sonus' civil RICO and unfair competition claims stem from those protected pre-suit licensing communications between Inventergy and Sonus and because these communications do not fall under the "sham" litigation exception to the *Noerr-Pennington* doctrine, Sonus' claims for civil RICO and unfair competition must be dismissed with prejudice.

### A. The Accused Conduct Alleged to Form the Basis for the Civil RICO and Unfair Business Practices Claims are Immune from Liability under Noerr-Pennington

The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people … to petition the Government for a redress of grievances." *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657 (1965). *See also Tal v. Hogan,* 453 F. 3d 1244, 1260 (10th Cir. 2006) (affirming dismissal of RICO claim based upon *Noerr-Pennington* doctrine). Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress (including litigation before the courts) are generally immune from statutory liability for their petitioning conduct. *Empress LLC v. City & Cnty. of S.F.,* 419 F. 3d 1052, 1056 (9th Cir. 2005). The *Noerr-Pennington* doctrine also applies to pre-suit communications between parties prior to the filing of any litigation. *See, e.g. Sosa v. DIRECTV, Inc.,* 437 F. 3d 923, 928 (9th Cir. 2006).

In *Sosa v. DIRECTV, Inc.,* the Ninth Circuit applied the *Noerr-Pennington* doctrine and affirmed the dismissal of a RICO suit against DIRECTV based on the predicate acts of mail fraud and extortion. *Id.* at 928. The claims were based on DIRECTV having sent tens of thousands of letters threatening litigation against persons whom DIRECTV had learned had purchased equipment that could be used to pirate satellite TV signals. The Court explained that *Noerr* provides "breathing space" for <u>conduct incidental to prosecution of a suit</u>:

> Consistent with the breathing space principal, we have recognized that, in the litigation context, not only petitions sent directly to the court in the course of

litigation, <u>but also conduct incidental to the prosecution of the suit is protected by the *Noerr Pennington* doctrine</u>. *Id.* at 934-35.

[P]receding the formal filing of litigation with an invitation to engage in negotiations to settle legal claims is a common, if not universal, feature of modern litigation…<u>Restricting such prelitigation conduct when the same demands asserted in a petition to the court is protected would render the entire litigation process more onerous, imposing a substantial burden on a party's ability to seek redress from the courts.</u> *Id.* at 936-37. [E]xtending *Noerr-Pennington* <u>immunity to litigation-related activities preliminary to the formal filing of the litigation is consistent with the law of the majority of other circuits that have considered this issue.</u> *Id.* at 937.

"[A] patentee must be allowed to make its rights known to a potential infringer so that the [potential licensee] can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction." *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997). "Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal." *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37-38 (1913).

*Noerr Pennington* has limits and does not apply to petitioning activity that, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.,* 362 F. 3d 1367 (Fed. Cir. 2004). *Globetrotter* establishes that pre-litigation communications are a sham if they are made in "bad faith." *Id* at 1375-77. For bad faith to exist, the claims must be "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Dominant Semiconductors Snd. Bhd. v. OSRAM GmbH,* 524 F. 3d 1254, 1262 (Fed. Cir. 2008). A litigant cannot be acting in bad faith if it has "probable cause" to institute a lawsuit. *Id.*

### B. Inventergy's Negotiations with Sonus are Immune as a Matter of Law under Noerr Pennington

In the instant case, all of the pre-suit communications prior to Sonus' filing of the instant action are protected by the *Noerr-Pennington* doctrine and mandate that Sonus' claims for civil RICO and unfair competition be dismissed.

The conduct alleged in the Second Amended Complaint as "predicate act conduct" arises in, or incident to, pre-suit communications concerning Sonus' infringement of Inventergy's patents. As Sonus alleges, this suit "aris[es] out of a patent dispute between Sonus and Inventergy" regarding patents that Inventergy acquired from Huawei and Nokia. Second Amended Complaint at ¶ 1, 13-14. "[B]etween August 2013 and January 2015, Sonus conferred with [Inventergy] on numerous occasions – including at least three in-person meetings" and Inventergy has sent "at least 35 emails, (and) participated in at least 10 phone calls with Sonus." *Id.* at ¶¶ 28 and 75. During the August 2013 licensing discussions, Inventergy provided Sonus with an explanation of its position that Sonus' products infringe patents acquired by Inventergy. Second Amended Complaint at ¶¶ 50-54. In October 2013, Inventergy provided Sonus an opportunity to present its arguments that it was not infringing Inventergy's patents. *Id.* at ¶ 55. Several weeks later, Sonus alleges it presented evidence that challenged the validity of the Inventergy patents. *Id.* at ¶ 57. In response during a November 25, 2013 call, Inventergy rebutted Sonus arguments and presented further evidence of Sonus' infringement of Inventergy patents, including claim charts of certain patents against certain Sonus products. *Id.* at ¶ 57-60. Sonus further alleges that between December 2013 and July 2014, Inventergy continued to contact Sonus about taking a license to its patents, including an in person meeting and providing a proposed license agreement. *Id.* at ¶¶ 61, 66-69. Sonus further alleges that in August 2014, Inventergy provided Sonus with additional claim charts detailing Sonus' infringement of additional patents. *Id.* at ¶70. On January 10, 2015, Inventergy "provided Sonus with a summary of their position 'regarding the Sonus products' infringement of the Inventergy intellectual property.'" *Id.* at ¶ 72. Tellingly, Sonus has not made any claims in any of its original, first, or second amended complaints that any of Inventergy's patents are invalid. As can be seen, all of the conduct alleged to form the basis for Sonus' civil RICO claim is derived from pre-suit communications in which Inventergy was merely asserting its rights to claim infringement of its patents against an infringer.

Under the *Noerr Pennington* Doctrine, exactly such pre-suit communications are protected speech and not subject to liability under civil RICO or California unfair competition law. As

aptly held by the Ninth Circuit in *Sosa,* 437 F. 3d at 934-935: "conduct incidental to the prosecution of the suit is protected by the *Noerr Pennington* doctrine." Further, "Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal." *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. at 37-38. Because all of the pre-suit communications from Inventergy are protected speech, they can not constitute the predicate acts for civil Rico and California unfair competition claims. Inventergy lawfully informed Sonus that it is infringing its patents and the two parties engaged in licensing negotiations.

**C.      Inventergy's Communications with Sonus were all made in Good Faith**

The crux of Sonus' allegations relating to civil RICO and California unfair competition are that Inventergy failed to offer Sonus or other potential "targets" a RAND license rate for the patents in Inventergy's portfolio that Sonus and other targets infringe. Sonus' allegations are without merit. Further, all of Inventergy's communications with Sonus during the course of the parties' licensing negotiations were made in good faith.

As stated by numerous courts "initial [licensing] offers [for standards essential patents carrying RAND obligations] do not have to be on RAND terms so long as a RAND license eventually issues." *See Microsoft Corp. v. Motorola, Inc.,* 2013 WL 5373179 (W.D. Wa. Sep. 24, 2013); *also see In Re Innovatio IP Ventures, LLC Patent Litigation*, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013). Plausible infringement claims are all that is necessary, despite alleged RAND obligations of asserted patents. *In Re Innovatio IP Ventures*, *LLC Patent Litigation,* 921 F. 3d 903, 917 (N.D. Ill. 2013); *see* also *Sosa,* 437 F.3d at 941 (holding there is no legal duty to disclose possible infringement defenses). It is not baseless for a patentee to assert infringement of a patent without disclosing RAND rates. *In Re Innovatio IP Venterus, LLC Patent Litigation.* at 915-916. Therefore, even if all of the allegations in the Second Amended Complaint were true, Claim 8 fails to state a claim on which the requested relief can be granted.

Moreover, Sonus has not pled facts sufficient to support a claim that Inventergy has withheld or refused to provide licenses based on RAND terms. As the Second Amended

Complaint acknowledges, not all of the patents are subject to RAND obligations. *See* Second Amended Complaint at ¶ 17 ("<u>several of the patents-in-suit</u> are subject to RAND commitments undertaken by Defendants' Predecessors before the IMS Standards organizations.") Nor has Sonus pled a basis to support the conclusion that the license as offered by Inventergy for its patent portfolio, including the patents-in-suit, could be said to violate RAND obligations with respect to a subset of the licensed patents. Sonus has merely offered the conclusory allegation that Inventergy has withheld or refused to provide licenses based on RAND terms. Nor has Sonus pled a necessary pre-condition to a breach of a RAND obligations claim: i.e., a request by Sonus for a license on RAND terms or even a statement by Sonus of what those RAND terms would be. And such bare allegations, even if made, would still not be sufficient to support its claim.

A similar unsuccessful allegation was addressed in the case of *In Re Innovatio IP Ventures, LLC Patent Litigation,* 921 F. Supp. 2d 903 (N.D. Ill. 2013). The plaintiff argued, similar to Sonus, that the patentee's failure to offer a RAND license to the patents-in-suit constituted a predicate act under civil RICO because "the manufacturers (alleged infringers) argue that [the patentee's] licensing campaign was a sham because it asserted infringement…before offering them a RAND license, offered licenses on terms less favorable than RAND terms, and failed to disclose its RAND obligations to the Targets." *Id.* at 914. The Court disagreed, holding that "the existence of an obligation to license a patent on RAND terms, without more, is not an actual express license providing a defense to infringement." *Id.* at 915. The Court found for the patentee, holding that plausible claims of infringement were all that was necessary to assert claims of infringement "despite its alleged RAND obligations." *Id.* at 917.

"The court need not … resolve the effect that *Innovatio*'s alleged RAND commitments have on its infringement claim at this time" as long as infringement allegations were not baseless and brought in bad faith. *Id.* The Court went on to conclude that "the court has not found any cases suggesting that the existence of a RAND commitment provides a complete defense against an infringement lawsuit." *Id.* at 915-916. Thus, even if the Court accepts Sonus' allegations that Inventergy did not disclose its RAND obligations, that omission does not render Inventergy's infringement claims baseless.

The facts supporting the holding of *Innovatio* are similar to the current case. As Sonus admits in the Second Amended Complaint, Inventergy presented and provided several claim charts explaining the basis for its infringement allegations. Second Amended Complaint at ¶¶ 59-60, and 70; see also Sobon Dec. at ¶¶ 11 and 12 . While Sonus attempts to dismiss these discussions by alleging it explained that Sonus does not infringe the patents-in-suit, this is immaterial. Moreover, in patent licensing negotiations, parties often disagree about the extent of infringing activity. A patent infringer's mere protestation of non-infringement cannot automatically render the patent owner's allegations baseless or bad-faith. *See, e.g., FindTheBest.com, Inc. v. Lumen View Technology LLC,* 20 F. Supp. 3d 451 (S.D. N.Y. 2014); *Deck v. Engineered Laminates,* 349 F.3d 1253, 1258 (10th Cir.2003); *United States v. Pendergraft,* 297 F.3d 1198, 1205–08 (11th Cir.2002).

Allegations in the Second Amended Complaint further support dismissal of these claims. For example, Sonus inherently admits that certain of its Accused Products are standards compliant, and that certain of Inventergy's patents read on those standards. *See* Second Amended Complaint at ¶¶ 9-12, 22. Otherwise, Sonus would have no basis for seeking RAND patent licenses if it did not have Accused Products that read on the 3GPP and ITU-T standards. *See Id.* at ¶ 17 ("Several of the patents-in-suit are subject to RAND commitments undertaken by Defendants' Predecessors before the IMS Standards organizations.") Indeed, since Sonus' seeks no declaration that any of the patents-in-suit are invalid, but yet argues that Inventergy failed to properly provide Sonus with a RAND license to such ostensibly infringing Accused Products, Sonus cannot at the same time logically hold that Inventergy's infringement claims are baseless or brought in bad-faith. Further, Sonus has not pled any specific facts to support any conclusion that the license as offered by Inventergy on the patents-in-suit – that admittedly would include patents NOT subject to RAND obligations – could be found to violate RAND obligations per se with respect to a subset of the licensed patents.

Because all the alleged communications between Inventergy and Sonus occurred pre-suit and Inventergy's assertions of infringement were not baseless, all of the communications are

protected under *Noerr Pennington*. Therefore, all of Sonus' claims, including Claim 9 (Civil

RICO), must be dismissed.

> **D.     Sonus' Allegations of Inventergy's "High Aggression" Litigation Tactics and Its Purported Intention to not offer Standards Licenses to SEPs as Evidence of Bad Faith are Without Merit.**

Whether Inventergy was supposedly implementing high aggression litigation tactics is

irrelevant to Sonus' claims (and as further set forth below, is completely belied by the documents

Sonus itself cites).  In its Second Amended Complaint, Sonus alleges that Inventergy has violated

Cal. Bus. & Prof. Code 17200 et seq. by:

> making affirmative misrepresentations and omissions about the need to take a license to the patent-in-suit, the encumbrances on those patents and the alleged validity and infringement of the patents-in-suit, using fear to extort license fees for amounts to which Inventergy is not entitled, including non-RAND amounts; violations of RICO…, and systematic breach of contract and engaging in broad scheme to obtain license fees for non-RAND amounts.

Second Amended Complaint at ¶ 132.  However, whether Inventergy implemented some vague

form of a "high aggression" litigation tactic does not establish any of these underlying facts.

Further, both the actual cited documents and the other facts pled by Sonus contradict that

Inventergy has in fact implemented a "high aggression" litigation tactic, least towards Sonus.  As

Sonus admits, the parties have been in discussions for over 18 months (Second Amended

Complaint at ¶ 75, admitting licensing negotiations "between August 2013 and January 2015")

and Sonus, not Inventergy, initiated this action.  Further, Sonus alleges that Inventergy has

identified over 125 potential licensing targets (*Id.* at ¶ 23), yet has only identified one other

litigation in which Inventergy has ever been involved (*Id.* at ¶ 23, e.g., the Genband case).

Further, Sonus completely mischaracterizes Inventergy's SEC filings, attempting to paint

Inventergy as a "patent-troll" only interested in instituting litigation against Sonus.  Sonus cites

page 18 of Inventergy's March 11, 2015 SEC filing, arguing that Inventergy has admitted to its

"high aggression" litigation tactics.  However, Sonus' exhibit details that Inventergy was at all

times interested in "business-led, not litigation led" licensing negotiations (Exhibit 2 to Sonus'

Motion for Leave to File Second Amended Complaint, at p. 17) and that litigation is only used

"as necessary to ensure that appropriate value is obtained" (*Id.*).  The document emphasizes

Inventergy's goal of avoiding litigation by engaging "first in collaborative business discussions as opposed to leading with litigation" (*Id.*).

In viewing Sonus exhibit that references "high aggression litigation," it is clear that Sonus has completely and purposefully misrepresented this document to paint an inaccurate picture to support its bad faith theory. For example on the same page that Sonus cites to support its portrayal of Inventergy as an aggressive litigation company, Inventergy has plainly stated that it does not engage in "high aggression" litigation and that it seeks to obtain the "right balance" and the "best total expected value" (*Id.* at p. 18).

As alleged by Sonus, Inventergy has in some way admitted that it has failed to disclose RAND obligations to Sonus or is unwilling to offer a RAND license to any SEPs (*See e.g.,* Second Amended Complaint at ¶¶ 6 & 27). But, these allegations are further evidence of Sonus' manipulation of the facts, because none of the materials that Sonus references in its Second Amended Complaint contain any evidence or statements to support those allegations. For example, Sonus alleges a March 7 Inventergy press release promised to honor obligations to license SEPs on RAND terms as to its Panasonic Portfolio. Sonus inexplicably cites that press release as evidence Inventergy is refusing to honor RAND obligations regarding SEPs in the Huawei and Nokia portfolios. But Sonus admits that nothing in that March 9 press release references the Huawei or Nokia portfolios (*Id.* at ¶27). Further, contrary to the allegations, Sonus admits that Inventergy has "stated that it acquires patents 'subject to existing licenses, existing business relationships and standards organizations obligations (including in certain cases, Fair Reasonable and Non-Discriminatory (FRAND) licensing obligations).'" (Second Amended Complaint at ¶ 25). These manipulation of facts seem simply calculated to concoct a false "bad-faith agenda", casting Inventergy as an egregious "patenttroll", with Sonus itself the one saying "nasty things" about Inventergy in litigation.

That Inventergy was aware that some of its patents were SEPs and that those patents were declared to ETSI is of no moment. Inventergy has not disclaimed any RAND obligations with respect to declared patents in its IMS/VoIP portfolios and has been open about those obligations (Second Amended Complaint at ¶ 25). And Inventergy has never refused to offer a license on

RAND terms for any SEPs.  In fact, Sonus has never requested a license to only SEPs that are subject to RAND obligations and the Second Amended Complaint does not allege that Sonus ever requested such a license.  Rather, Sonus admits that the potential licenses under discussion between the parties was always for those Inventergy patents relevant to Sonus' products and business, not just patents that were essential to practicing standards (*see, e.g., Id.* at ¶ 25:  "During the August 2013 meeting, Inventergy asserted that … certain Inventergy patents cover Technology used in Sonus' products;  *Id.* at ¶ 58:  At the November 25, 2013 meeting … Inventergy alleged that Sonus sells components covered by one or more Inventergy patents).  Moreover, during licensing negotiations, the parties discussed that there might be alternative approaches to licensing, including licensing only a portion of the IMS portfolio relevant to Sonus' business.

### E.     *Noerr-Pennington* also Precludes the State Law Claim for Unfair Competition under California Business and Professions Code § 17200

Federal preemption mandates that the *Noerr-Pennington* doctrines apply to Sonus' unfair competition claim brought under California Business and Professions Code § 17200.  As explained in *Globetrotter:*  Our decision to permit state-law tort liability for only objectively baseless allegations of infringement rests on both federal preemption and the First Amendment …. the same First Amendment policy reasons that justify the extension of *Noerr* immunity to pre-litigation conduct in the context of federal antitrust law apply equally in the context of state-law tort claims. *Globetrotter,* 362 F. 3d at 1377.

As aptly stated by the Court in *In Re Innovatio IP Ventures, LLC Patent Litigation,* 921 F. 3d at 913, in finding that the California State unfair competition claim under § 17200 related to pre-suit licensing communications on purported non-RAND terms was also precluded by *Noerr-Pennington*:  *"Globetrotter* thus requires the application of *Noerr-Pennington* to shield pre-suit communications from state law claims."  Similar to the facts of this case, because *Noerr Pennington* precludes any liability for Inventergy on Sonus' civil RICO claim, and Sonus' unfair competition claim is based on the same allegedly improper course of conduct as Sonus' civil

24

RICO claim, Sonus' unfair competition claim under California Business and Professions Code § 17200 is also precluded.

Moreover, because Sonus' federal claims (patent and civil RICO) must be dismissed, the Court should further dismiss Sonus' California state law claims for unfair competition, and breach of contract, per 28 U.S.C. § 1367(c)(3). Under that provision, a district court "may decline to exercise supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction." "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Executive Software N Am. V. United States District Court,* 24 F. 3d 1545, 1553 n. 4 (9th Cir. 1994). Similar to the current case, because Sonus' federal claims for Declaratory Judgment of Non-Infringement and civil RICO should be dismissed, the Court should decline to exercise supplemental jurisdiction not only over the California unfair competition claim, but the breach of contract claim as well, discussed *infra*.

## F. The Complaint Further Fails to Allege Facts Sufficient to Support Predicate Acts of Mail Fraud, Wire Fraud, Extortion, and California Unfair Competition

Moreover, even assuming *arguendo* that the Court does not dismiss Sonus' civil RICO and California unfair competition claims under *Noerr Pennington,* Sonus has also failed to state a claim under *Twombly. See Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). *Twombly* mandates that a RICO plaintiff do more than provide "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 555.

### 1. Sonus has Failed to Plead a Plausible Pattern of Racketeering Activity

Civil RICO is intended to prevent criminal activity from infiltrating legitimate businesses. That statute is aimed at patterns of racketeering activity and therefore requires criminal "predicate acts." The plaintiff must show that the predicates are related, and that they amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Nw. Bell Tel. Co*, 492 U.S. 229, 239 (1989). In this case, Sonus has alleged only formulaic recitals of predicate acts of mail fraud, wire fraud, and extortion under both federal and state law (described in detail *infra*).

### 2. Sonus' Allegations that Inventergy Committed Both Mail and Wire Fraud is Plead Woefully Inadequately

A wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or fraud. *Odom v. Microsoft Corp,* 486 F. 3d 541, 554 (9th Cir. 2008); 18 U.S.C. § 1343. Mail fraud differs only in that it involves the use of the United States' mails rather than wires. *See Schreiber Distributing v. Serv-Well Furniture,* 806 F. 2d 1393, 1400 (9th Cir. 1986) *also see* 18 U.S.C. § 1341. The requirement of specific intent under these statutes is satisfied by "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension" and this intention is shown by examining the scheme itself. *Schreiber Distributing,* 806 F. 2d at 1400. Federal Rule of Civil Procedure 9(b) requires that fraud be pled with particularity. Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Odom,* 486 F. 3d at 554. Mail and wire fraud require particularized allegations of the factual circumstances of the fraud itself. *Id.* Rule 9(b) "requires that the pleadings contain explicit rather than implied expression of the circumstances constituting fraud." *Exergen Corp v. Wal-Mart Stores, Inc.,* 575 F. 3d 1312, 1327 (Fed. Cir. 2009). Specifically, "Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission." *Id.*

Sonus' bald allegations in its complaint for what constitutes both mail and wire fraud in this case are woefully inadequate, and even if accepted as true, fail to show that Inventergy engaged in any unlawful activity at all. As the Supreme Court has stated: "Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal." *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37-38 (1913). For example, in describing the purported predicate acts at Paragraph 143 of Sonus' Second Amended Complaint regarding wire and mail fraud, Sonus fails to even identify what supposed "false and misleading" information Inventergy purportedly provided or failed to provide to any targets, including Sonus. Moreover,

the fact that Inventergy requested Sonus take a license to its patents, including the patents-in-suit, hardly constitutes either mail and wire fraud, especially considering the fact that Sonus has not sought declaratory judgment of invalidity of any of the patents.

Further, Sonus readily states that only some of the patents within Inventergy's portfolio are standards related (see Second Amended Complaint at ¶ 17), undermining any argument that Inventergy somehow failed to offer Sonus RAND patent licensing offers as to all of the patents-in-suit, not all of which are SEPs. Moreover, "initial offers do not have to be on RAND terms" even for patents that are standards complaint and subject to RAND obligations. There simply is no specific pleading by Sonus that would constitute either wire or mail fraud, even accepting Sonus' allegations as true. At best, Sonus has alleged that Inventergy was asking for an excessive amount of money for its entire IMS portfolio. However, even with RAND commitments, such an allegation, even if true, cannot amount to wire fraud or extortion. Where the underlying act of making a good-faith infringement assertion and requesting a license (even without, arguendo, disclosing RAND obligations) is not a violation of any law and is condoned by the law, such activity cannot be the basis for alleging criminal activity.

Sonus also has failed to provide sufficient detail by failing to identify any "other targets" to whom Inventergy has allegedly provided "false and misleading information." Sonus cannot claim that Inventergy provided "false and misleading information" to Sonus or anyone else without identifying exactly what that false and misleading information is.

Further, to constitute a RICO predicate act, a pleading of wire fraud or mail fraud must plausibly allege reliance on the misrepresentations at issue. *In Re Actimmune Marketing Litigation,* 641 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009). Because a plaintiff must show that he is "injured in his business or property by reason of" a pattern of mail or wire fraud, reliance is an essential part of demonstrating causation between a defendant's misrepresentations and the plaintiff's injury. *Id.; also see* 18 U.S.C. § 1964(c). "In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation … In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. 2131, 2144 (2008). Nowhere in Sonus'

complaint do they allege at all how they in fact relied on any purported misrepresentations made by Inventergy.  Any argument by Sonus that their reliance on Inventergy's representations to enter into licensing negotiations somehow constitutes reliance for either mail fraud or wire fraud is without merit because Inventergy has the lawful right to assert infringement against entities that Inventergy has a good faith basis for believing infringes its patents, and in any case the parties have not entered into any sort of licensing arrangement as yet.  *Va. Panel Corp.,* 133 F.3d at 869.

### 3. Sonus' Allegations that Inventergy Committed Extortion as a Predicate Act Is Also Woefully Inadequate

Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Sosa,* 437 F. 3d at 939; 18 U.S.C. § 1951.  California's extortion statute likewise requires "the wrongful use of … fear" and does not apply to fear caused by the threat of litigation.  *Sosa,* 437 F. 3d at 939, interpreting Cal. Penal Code § 518.

Sonus claims Inventergy committed extortion under 18 U.S.C. § 1951 and Cal. Penal Code § 518 by the use of "fear and extortion using the alleged legitimacy of Inventergy's patent rights". *See* Second Amended Complaint at ¶ 144. However, even taking all of the facts as pled by Sonus to be true, they are insufficient to establish that any violation of these laws occurred. First, in the Second Amended Complaint (*see* ¶¶ 9-12, 22) Sonus admits that they adhere to the IMS standards and that they are therefore beneficiaries of the rights under the IPR policies, admitting that Sonus in fact practices the infringing claims.  Therefore, under the Second Amended Complaint, the predicate act allegations of extortion must fail because the claims made by Inventergy are "claims of right."  Inventergy's efforts to obtain licenses amount to seeking something Inventergy is entitled to pursue – licenses to its valid patents. In other words, the alleged extortion is not "wrongful" because Inventergy has a statutory right to seek royalties.  The Federal Circuit has held in the analysis of whether extortion is a predicate act to a civil RICO claim, "a defendant is not guilty of extortion if he has a lawful claim to the property obtained." *Brokerage Concepts v. United States Healthcare,* 140 F. 3d 494 (Fed. Cir. 1998).

Further, there is no allegation that Sonus lost any property that they were entitled to – a requirement for proving a predicate act of extortion in the civil RICO context. *See* Second Amended Complaint at ¶ 143. As explained in *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 404-05 (2003), in denying extortion as a predicate act under civil RICO, the Supreme Court held: "Petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received "something of value" from respondents that they could exercise, transfer, or sell." Moreover, Sonus did not experience the required legitimate fear. *See* Second Amended Complaint at ¶¶ 132 and 144. The threat of a costly lawsuit, or a party merely alleging its rights to patents it duly owns and requesting to be paid a license, does not rise to a relevant level of "fear" required under an extortion predicate offence under civil RICO. *Sosa,* 437 F. 3d at 939. Further, Inventergy's claim of right defense would only be inapplicable if Sonus had a "preexisting right to be free of the fear he is quelling in return for his payment to the defendant." *Id.* at 525. There is no statutory immunity for users of patents rights to be free of fear from infringement claims. *See Universal Manufacturing Co. v. Douglas Press, Inc.,* 1991 WL 83156, at *2 (N.D. Ill. May 8, 1991); *also see HTC Swed. AB v. Innovatech Prods. & Equip. Co.,* 2008 WL 4510710 (E.D. Tenn. Sep. 30, 1998). The civil RICO claim based on predicate acts of extortion fail as a matter of law.

### G. The Complaint Fails to State a Claim for Unfair Competition under California Business and Professions Code § 17200

In its eighth cause of action, Sonus has also failed to state a claim upon which relief can be granted for its claim for Unfair Competition under California Business and Professions Code § 17200. For conduct to constitute unfair competition, that conduct must be either "unlawful, or unfair, or fraudulent." *Cel-Tech Communications v. La Cellular,* 83 Cal. Rptr. 2d 548, 560 (1999). Unfair competition includes "anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.*

The purported conduct of Inventergy comprising unfair competition includes (1) alleged misrepresentations to Sonus regarding the need to take a license; (2) purported failure by

Inventergy to disclose encumbrances on those patents and the alleged validity and infringement of the patents-in-suit; (3) using fear to extort license fees for which Inventergy is not entitled, including non-RAND amounts; (4) violations of RICO; and (5) breach of contract.  Second Amended Complaint at ¶ 132.

Regarding point 1, Inventergy never made any misrepresentations to Sonus regarding the need to take a license.  In fact, Inventergy had a good faith basis that Sonus was infringing its patents, even providing Sonus with claim charts evidencing such infringement.  Sonus, in fact, admits that certain of the Accused Products implement IMS standards, and that certain of the patents-in-suit are standards relevant. As held by the Federal Circuit, "[A] patentee must be allowed to make its rights known to a potential infringer so that the [potential licensee] can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction." *Va. Panel Corp.,* 133 F.3d at 869.  Inventergy's statements to Sonus of its need to take a license to Inventergy's portfolio were not baseless.  Regarding point 2, plausible claims of infringement are all that is necessary to assert claims of infringement, despite alleged RAND obligations of asserted patents. *In Re Innovatio IP Ventures*, *LLC Patent Litigation,* 921 F. 3d 903, 917 (N.D. Ill. 2013).  While Sonus may claim that alleged RAND obligations were somehow withheld, this is negated by the fact that Inventergy indicated during negotiations that certain of its patents were standards relevant.  (Sobon Dec. at ¶¶ 8 and 11).  But even if Sonus' allegation were correct and Inventergy had not disclosed its RAND obligations, because Inventergy's communications are protected under *Noerr Pennington* Doctrine, such exchanges cannot be found to be the basis for an unfair competition claim.  For the reasons discussed *supra*, as to Point 3, Inventergy did not engage in any predicate act of extortion, nor did Inventergy violate civil RICO for Point 4.  Moreover, for the reasons discussed *infra*, Inventergy has not breached any contract.

### H.    The Complaint Fails to State a Claim for Breach of Contract

Sonus has failed to state a claim for breach of contract because, as plead, Sonus has not shown that what Inventergy offered to Sonus during licensing negotiations for the entire

30

Inventergy patent portfolio violated any RAND licensing obligations that Inventergy might have on a subset of that portfolio that might include standards essential patents. Even if the terms of the SEP contracts as alleged in the Second Amended Complaint apply to some patents in the Inventergy portfolio, those terms do not extend to patents that are not subject to RAND obligations. Therefore any contract that Sonus might have identified with specificity in the Second Amended Complaint still fails to address the facts of the actual licensing negotiation between Inventergy and Sonus. Mr. Sobon never in any of communications with Mr. Snider or anyone at Sonus, suggested or explicitly disavowed any obligation that if any of our patents are truly standards-essential, that those come with certain FRAND obligations, nor that if Sonus ever requested a license simply to any such SEPs, we would not have begun negotiations on such a license. (Sobon Dec. at ¶ 18.) Reference to the March 9, 2015 press release as further evidence of a breach of contractual commitments is an irrelevant red herring. Allegations that Inventergy's press release regarding its Panasonic Portfolio and statements regarding SEP licenses on RAND terms does not mean that Inventergy refused to honor RAND obligations regarding SEPs in the Huawei and Nokia portfolios.

That Inventergy was aware some of its patents were SEPs and those patents were declared to ETSI is of no moment, and certainly does not constitute a breach of contract. Inventergy has not disclaimed any RAND obligations with respect to declared patents in its IMS/VoIP portfolios and has been open about those obligations (Sobon Decl. at ¶ 17; Second Amended Complaint at ¶ 25). And Inventergy has never refused to offer a license on RAND terms for any SEPs (Sobon Decl. at ¶ 17). In fact, Sonus has never requested a license to only SEPs that are subject to RAND obligations (Sobon Decl. at ¶ 17 ) and Sonus does not allege that it ever requested a license to only the SEPs, moreover where such request was refused. Rather, the license under discussion between the parties was at all times for all patents Inventergy owns relevant to Sonus' products and business, not just patents that were essential to practicing standards (*see, e.g., Id.* at ¶ 25: "During the August 2013 meeting, Inventergy asserted that … certain Inventergy patents cover Technology used in Sonus' products; *Id.* at ¶ 58: At the November 25, 2013 meeting … Inventergy alleged that Sonus sells components covered by one or more Inventergy patents).

Further, during licensing negotiations, the parties discussed that there might be alternative approaches to licensing, including licensing only a portion of the IMS portfolio relevant to Sonus' business.

Finally, to the extent that Sonus argues that Inventergy's failure to offer a RAND license constitutes a breach of contract that Inventergy's predecessors made with 3GPP and ITU-T that Sonus can assert on behalf of 3GPP and ITU-T as a third-party beneficiary, "initial offers do not have to be on RAND terms so long as a RAND license eventually issues." *See Microsoft Corp. v. Motorola, Inc.,* 2013 WL 5373179 (W.D. Wa. Sep. 24, 2013).

### IV. IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS ACTION UNDER 28 U.S.C. § 1404(A)

For efficiency and judicial economy, even if the Court finds that there is subject matter jurisdiction and declines to exercise its discretion and dismiss, the Court should transfer Sonus' complete action to the District of Massachusetts. In preemptive declaratory judgment actions, such as is the case here, the Court need not give deference to the first filed rule especially where, as in this case, there are compelling reasons to transfer the first filed action. Moreover, for the reasons discussed *infra,* Sonus' claims for civil RICO, unfair competition, and breach of contract should be dismissed by the Court for failure to state a claim upon which relief can be granted and the transfer analysis should not be affected by the gamesmanship engaged in by Sonus to assert civil RICO and state law claims in an attempt to persuade the Court to keep the case in this Court.

### A. The Northern District of California is an Inconvenient Forum and this Action Should be Transferred to the District of Massachusetts

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The first filed rule analysis parallels transfer of venue under 28 U.S.C. § 1404(a). *Genentech, Inc. v. Eli Lilly & Co.,* 998 F. 2d 931, 937-938 (Fed. Cir. 1993).

As a threshold matter, Inventergy had numerous contacts with the District of Massachusetts during the course of the parties licensing negotiations. There were three in-person meetings at Sonus' headquarters in Massachusetts, as well as numerous telephone calls directly related to this action. There were no in-person meetings other than at the offices of Sonus in

Massachusetts. The extent of these contacts warrants the District of Massachusetts exercising specific jurisdiction over Inventergy in an action filed by Sonus in Massachusetts. *See, e.g., Schwarzenegger v. Fred Martin Motor Co.*, 374 F. 3d 797, 802 (9th Cir. 2004).

While the general rule favors the forum of the first-filed action, whether or not it is a declaratory judgment action, trial courts have discretion to make exceptions to this general rule in the interest of justice or expediency, as in any issue of choice of forum. *Micron Technology, Inc. v. Mosaid Technologies,* 518 F. 3d 897, 904 (Fed. Cir. 2008), *citing Genentech,* 998 F.2d at 937. These exceptions are not rare. *Id.* First, a district court may consider a party's intention to preempt another's infringement suit when ruling on the dismissal of a declaratory action. And that consideration is merely one factor in the analysis. *Id.* at 938. Other factors include: the convenience and availability of witnesses; the absence of jurisdiction over all necessary or desirable parties; and the possibility of consolidation with related litigation. *Id.* "[T]he considerations affecting transfer to or dismissal in favor of another forum do not change simply because the first-filed action is a declaratory action." *Id.* The first-filed suit rule, for instance, will not always yield the most convenient and suitable forum. Therefore, the trial court that is weighing jurisdiction additionally must consider the real underlying dispute: the convenience and suitability of competing forums. *Id.*

In addition to the factors identified in 28 U.S.C. § 1404(a), the Ninth Circuit has articulated both private and public factors that the Court may consider. Private factors relevant to this case include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). Public factors relevant to this case include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; . . . and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.; Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

## B.     The District of Massachusetts is the Most Convenient Forum

The majority of relevant facts as applied to the private and public factors show that this action should be transferred to the District of Massachusetts. These facts include:

- All three in-person meetings between Inventergy and Sonus occurred at Sonus' facilities in Westford, Massachusetts within the District of Massachusetts, and there have been no in-person meetings in California (Sobon Dec. at ¶15);
- Sonus has argued that some employees reside in this District, but the majority of necessary witnesses to this action reside in the District of Massachusetts. For example, on information and belief, the majority of relevant technical staff of Sonus are located at or near the Sonus facilities in Westford, Massachusetts. Depositions will likely take place in the District of Massachusetts, and most of the relevant documents from Sonus will likely be located in the District of Massachusetts (and at least more likely to be located in the District of Massachusetts than the Northern District of California);
- Sonus also has technical staff in England; if any of these individuals are needed to provide testimony it will be more convenient for these witnesses to attend depositions and court proceedings in the District of Massachusetts than the Northern District of California;
- The NDA was executed at Sonus' facilities in Westford, Massachusetts (Sobon Dec. at ¶ 12);
- Ease of access to Sonus' evidence is more readily accessible in the District of Massachusetts, as this is Sonus' principal place of business. While Inventergy's files will also be relevant, the main evidence from Inventergy will be its patent files, prosecution histories, etc. most of which are easily accessible on-line and are publicly available;
- Inventergy will make available for compulsory service of process all Inventergy employees in the District of Massachusetts (Sobon Dec. at ¶ 19);
- The District Court in Massachusetts has jurisdiction over both parties;
- In FY2014, Northern District of California Judges had a significantly higher workload, as compared to District of Massachusetts Judges. There were 593 Weighted Filings per Judgeship in the Northern District of California, as compared to 378 Weighted Filings per Judgeship in the District of Massachusetts. [3] (http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district-courts-september-2014.aspx)
- Based on these statistics, the workload for Judges in the Northern District of California is 56.8% greater than the workload for Judges in the District of Massachusetts.

Some of the Facts are Neutral:

- Both the District of Massachusetts and the Northern District of California have local patent rules which will streamline the handling of this case;
- Median Time from Filing to Trial in the District of Massachusetts = 27.3 Months (http://www.uscourts.gov/Statistics.aspx)

---

[3] Definition of Weighted Filings: Weighted filings statistics account for the different amounts of time required to resolve various civil and criminal actions. Average civil cases or criminal defendants each receive a weight of approximately 1.0; for more time-consuming cases, higher weights are assessed (e.g., a death-penalty habeas corpus case is assigned a weight of 12.89); and cases demanding relatively little time from judges receive lower weights (e.g., an overpayment and recovery cost case involving a defaulted student loan is assigned a weight of 0.10).

- Median Time from Filing to Trial in the Northern District of California = 30.9 Months (http://www.uscourts.gov/Statistics.aspx)

Sole Fact Not in Support of Transfer:
- Inventergy's principal place of business is in the Northern District of California (Sobon Dec. at ¶ 20).

These facts are relevant to the private and public factors, and they clearly indicate that if the Court finds that it has subject matter jurisdiction, the action should be transferred to the District of Massachusetts. Although Sonus filed first in this Court, the facts overwhelmingly overcome the presumption and preference for the first filed forum. The most convenient and suitable forum to hear this action is the District of Massachusetts. For the reasons discussed *infra* in Section III, Sonus' claims for civil RICO, unfair competition, and breach of contract should be dismissed by the Court for failure to state a claim upon which relief can be granted and the transfer analysis should not be affected by the gamesmanship engaged in by Sonus to assert civil RICO and state law claims in an attempt to persuade the Court to keep the case in this Court.

## V. CONCLUSION

Counts 1 – 7 of Sonus' Second Amended Complaint must be dismissed for lack of subject matter jurisdiction, and Counts 8 – 10 of Sonus' Second Amended Complaint must be dismissed for failure to state a claim upon which relief can be granted. In the alternative, the Northern District of California is an inconvenient forum under 28 U.S.C. § 1404. When the Court considers the private and public factors, the instant case should be transferred to the District of Massachusetts if it is not dismissed.

Dated: May 29, 2015          Respectfully submitted,

Novak Druce Connolly Bove + Quigg LLP


By:   /s/Chris L. Holm
       Chris L. Holm
       Attorneys for Defendants Inventergy, Inc.,
       and Inventergy, Global, Inc.

# CERTIFICATE OF SERVICE

The undersigned certifies that on August 3, 2015, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Northern District of California, using the Court's Electronic Case Filing (ECF) system. The ECF system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented to accept this notice of this document by electronic means.

Dated: August 3, 2015                           NOVAK DRUCE COLLONNLY BOVE +QUIGG

By: /s/AJ Cruickshank
AJ Cruickshank